***********
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Deluca and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Deluca with minor modifications.
 *********** *Page 2 
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties as:
 STIPULATIONS
1. At the time of the alleged injury giving rise to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At such time, an employment relationship existed between Plaintiff and Defendant-Employer.
3. Key Risk Insurance Company was the carrier on the risk for Defendant-Employer.
4. The date of injury that gives rise to this claim is on or about April 30, 2003.
5. At the time of the injury, the parties stipulated that Plaintiff's average weekly wage was $549.50, with a corresponding compensation rate of $366.35.
 *********** ISSUES
The issues before the Commission for resolution are as follows:
1. Whether Plaintiff has established disability;
2. Whether Defendants were obligated to reinstate temporary total disability benefits following the order issued by the Executive Secretary on February 8, 2006, and/or the order issued by Deputy Commissioner Delcua on April 3, 2006;
3. Whether a 10% penalty should be imposed on any past due temporary total disability benefits;
4. Whether Plaintiff should be compensated for his permanent partial disability impairment rating; *Page 3 
5. Whether Plaintiff committed fraud, and if so, what if any sanctions should be imposed;
6. Whether any sanctions should be imposed on Defendants;
7. Whether the stipulation of average weekly wage in the pre-trial agreement should be set aside to allow recalculation of average weekly wage; and
8. Whether Plaintiff is entitled to additional medical treatment for the conditions related to his compensable injury.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 46 years old and had a ninth grade education at the time of the hearing before the Deputy Commissioner in this matter. Plaintiff was a welder and pipe fitter for the Defendant-Employer and had worked there for approximately two and a half years as of April 30, 2003. His job included installing new pipe and steamlines, demolition and welding and was heavy work.
2. On April 30, 2003 Plaintiff was performing a welding job for the Defendant-Employer on site at Craven Regional Medical Center in New Bern, Craven County, North Carolina. He was working on a piece of pipe weighing between 250 and 300 pounds that is called a "T", which is a junction of pipes. The "T" was resting on two "sawhorses", themselves made of pipe, while Plaintiff welded a "90", a pipe that turns 90 degrees to the "T". The pipes out of which the sawhorses were made were covered with red paint or primer. Plaintiff's right hand was inside the "T" with the palm facing up while he welded with his left hand. During the *Page 4 
act of welding, the sawhorse kicked out from under the "T" it was supporting, causing the pipe it was supporting to fall. The falling pipe caused Plaintiff's right hand to strike against the steel pipe of the sawhorse, and the weight of the "T" caught Plaintiff's ring and pinky fingers causing severe lacerations and a crushing injury to those fingers, despite the fact that Plaintiff was wearing a glove. Plaintiff's fingers were bleeding and his glove had a red mark on the back of the wrist area where Plaintiff's hand struck the sawhorse.
3. The injuries to the right pinkie and ring fingers only were accepted as compensable pursuant to a Form 60.
4. Plaintiff walked to the emergency room at Craven Regional Medical Center where he was treated for his lacerations and x-rays were taken of his right hand. No complaints were noted at the emergency room for anything other than the fingers of his right hand. Medical records from this visit document a crush injury to Plaintiff's right hand. Plaintiff left the hospital with his mother, Louise Dillard, who took him home. The injuries to the fingers on Plaintiff's right hand caused severe pain. That night, Plaintiff and his mother also noted pain and swelling on the back of Plaintiff's right hand in the wrist area.
5. Following the initial treatment at the Emergency Room, Plaintiffs fingers were evaluated by Dr. Armistead. The Plaintiff had previously been treating with Dr. Armistead for unrelated neck pain. Dr Armistead believed that Plaintiff had a soft tissue injury which he thought was going to "clear quickly".
6. On or about May 3, 2003 Plaintiff was contacted by a radiologist at Craven Regional Medical Center who noted that the x-rays taken at the hospital had shown a possible scaphoid (a bone in the wrist) irregularity. The doctor advised Plaintiff "that if he continued to have pain over the wrist that he needs to follow-up with orthopedics again." *Page 5 
7. Plaintiff returned to Dr. Armistead on May 6, 2003. Dr. Armistead noted that the Emergency Room had called to state that Plaintiff had a fracture of his scaphoid. Dr. Armistead specifically noted that the Plaintiff had full range of motion, excellent strength and that x-ray exams showed no specific acute abnormalities of the scaphoid, but diagnosed the Plaintiff with scaphoid contusion. On May 12, 2003, Dr. Armistead noted that the Emergency Room clarified the scaphoid changes were determined to be old, and "probably not related at all to his recent injury."
8. Defendants sent Plaintiff to be evaluated and treated by Dr. George Edwards in Raleigh, North Carolina. Dr. Edwards initially saw Plaintiff on August 28, 2003. He felt that Plaintiff had developed a carpal boss, a bony spur development in the right wrist, at the site of the injury. Dr. Edward's sought and received authorization from the Defendants on or about September 2, 2003, to excise the carpal boss. The operation was performed on September 23, 2003. Plaintiff continued to have pain in the area of the operation on his right wrist. Dr. Edwards injected the scar site on several occasions which provided some relief from the symptoms. On December 4, 2003 Dr. Edwards noted that Plaintiff still had problems at the incision site, but released him with a 12% impairment to the right hand. Dr. Edwards thought that Plaintiff would be precluded from performing strenuous work for an "undetermined period of time." In his deposition, Dr. Edwards testified that on the basis of the history given by Plaintiff, he related the carpal boss injury to the compensable injury of April 30, 2003, but not the carpal tunnel syndrome or scaphoid condition.
9. Plaintiff had been out of work since the date of injury up until December 1, 2003, at which time he made an unsuccessful attempt to return to work. After Dr. Edwards released *Page 6 
Plaintiff in December, 2003, Plaintiff continued to have difficulty in his wrist and returned to see Dr. Armistead for further evaluation and treatment.
10. On March 18, 2004, Dr. Wooten examined Plaintiff. Dr. Wooten evaluated the Plaintiff for his complaints of hand pain, and noted that the Plaintiff suffered from what he reported to be "incapacitating pain," but that there were no objective findings on the exam, x-rays, or MRI scan to explain the pain. Dr. Wooten testified "he told me he had been out of work for one year, and the injuries did not appear to be severe enough to account for that degree of instability or function."
11. Dr. Wooten placed a two-pound restriction on Plaintiff, which he clarified was temporary while Plaintiff underwent further testing. Dr. Wooten also testified that as of April 19, 2004, the Plaintiff could return to work with a five-pound lifting restriction for four (4) weeks, then he would be permitted to return to regular duty thereafter. Dr. Wooten did not anticipate that the Plaintiff would need further treatment. Dr. Wooten did not relate any of Plaintiff's wrist conditions to the compensable injury.
12. Dr. Armistead found that Plaintiff still had a knot on the back of his wrist and excised this knot in early July, 2004.
13. Plaintiff also underwent a second opinion evaluation with Dr. Richard Moore, a board certified expert in orthopedic hand surgery, on November 18, 2004. Dr. Moore diagnosed the Plaintiff with the carpal boss; a crush injury involving Plaintiff's fingers which he felt did not require any further medical intervention; post-traumatic carpel tunnel syndrome, which he felt warranted consideration of a carpel tunnel release; and STT arthrosis which he initially felt may require surgery. *Page 7 
14. Dr. Moore confirmed that Plaintiff suffered from a pre-existing injury involving his scaphoid. He explained that Plaintiff had an "irregularity of the scaphoid lunate articulation," and that an old fracture in the STT joint had likely never healed and was the most likely source of Plaintiff's pain.
15. Dr. Armistead also felt that Plaintiff had developed carpal tunnel syndrome for which he performed an operation on Plaintiff's wrist on or about January 7, 2005.
16. As of April 28, 2005, Dr. Moore felt that Plaintiff had reached maximum medical improvement and stated that he was unsure as to whether Plaintiff's symptoms warranted surgery, and that in his opinion, the Plaintiff was released to a medium duty position. He noted that Plaintiff would have difficulty lifting more than 5 to 10 pounds, and would have difficulty with wrenches, pliers, welding machines, channel locks and other components of his job as a pipe fitter.
17. On June 23, 2005, Plaintiff presented to Dr. Moore again complaining of pain and stating that he was in need of pain medication. Dr. Moore did not recommend treating Plaintiff with chronic narcotics, but recommended injecting the STT joint.
18. Plaintiff last saw Dr. Armistead in August, 2005. Dr. Armistead placed permanent restrictions on Plaintiff's work; specifically, Dr. Armistead limited Plaintiff to no lifting greater than 10 pounds, no repetitive motion, primary use of the left hand and no climbing. In his deposition, Dr. Armistead related Plaintiff's carpal tunnel syndrome and scaphoid condition aggravation to the compensable injury. Moreover, he opined that the compensable injury and subsequent surgery were factors in the treatment he gave to the carpal boss injury. *Page 8 
19. Plaintiff did not seek further treatment with Dr. Moore until January 5, 2006. At this time Plaintiff again complained of significant pain and limitations and Dr. Moore felt that Plaintiff would benefit from an STT fusion.
20. Based upon the level of function observed in Plaintiff's video surveillance, Dr. Moore probably would not have recommended the STT fusion surgery.
21. Dr. Moore placed permanent limitations on Plaintiff's ability to work. Specifically. Dr. Moore limited Plaintiff to lifting 5 to 10 pounds and felt he would have difficulty using wrenches, pliers, welding machines, channel locks and other primary components of his job. He also limited any work to no repetitive activity, no environmental extremes and ground level work only. Dr. Moore also believed Plaintiff would be a candidate for Vocational Rehabilitation and stated that he would be glad to review any job descriptions. In his deposition, Dr. Moore related Plaintiff's carpal tunnel syndrome to the compensable injury of April 30, 2003. He testified that the carpal boss injury was consistent with the mechanism of injury provided by Plaintiff. He also indicated his belief that based on faster than normal progression of Plaintiff's scaphoid arthrosis, aggravation of that condition was consistent with the mechanism of injury described by Plaintiff.
22. Following a review of medical records, Dr. Szura concluded that Plaintiff had a chronic, pre-existing STT Joint and Scaphoid condition. Dr. Szura opined that the work injury of April 30, 2003 did not cause or exacerbate this condition or any other condition aside from Plaintiff's finger injuries.
23. Other than one day in December, 2003, Plaintiff has never returned to work for the Defendant-Employer. No vocational rehabilitation services were ever offered by the Defendants to Plaintiff. Defendant-Employer was asked on numerous occasions from January *Page 9 
16, 2004 through July 27, 2005 by Sylvia Thomas, nurse case manager, if work was available for Plaintiff within the restrictions given by Plaintiff's doctors. There was no work available with the Defendant-Employer within those restrictions at any time during this period.
24. A labor market survey was undertaken by Mr. Greg Henderson at Defendant's request in February, 2006. That labor market survey identified no suitable employment and no specific jobs for which Plaintiff qualified either physically with his restrictions or vocationally with a 9th grade education. In his deposition, Mr. Henderson opined that Plaintiff demonstrated transferable skills in his business that would enable him to secure employment in the competitive labor market.
25. Plaintiff was ultimately able to return to work for a company called ENCEE Chemicals on November 27, 2006 earning the same wage rate he was earning for the Defendant-Employer. His job at this employment required no heavy lifting and was generally within the restrictions set forth by Plaintiff's treating physicians. Plaintiff obtained this job after a three to four month job search beginning in August 2006 that he undertook on his own behalf with no assistance from Defendants.
26. At the time of the incident of April 30, 2003, Plaintiff operated two concurrent business ventures that sold jewelry, paintballs, AirSoft guns and other like items known as Paul's Jewelers and Paul's Paintballs. Plaintiff operated these businesses via the internet and gun shows and flea markets that Plaintiff attended on average two weekends per month. He had operated these businesses in one form or another for several years prior to injuring his fingers and wrist on April 30, 2003 and he continued to operate these businesses after the injury. At the gun shows and flea markets that he attended the most physical work that was required of Plaintiff was the loading and unloading of the merchandise twice a day during the gun shows or flea *Page 10 
markets. Most of the items were stored in boxes that weighed at most 30 pounds and could be carried with both hands. Even this activity would cause Plaintiff's right hand to hurt, swell up and become discolored. Nevertheless, Plaintiff continued to try and build up his business during the time he was out of work after April 30, 2003.
27. Plaintiff maintained that he lost money in these business ventures both before and after the date of the injury. Defendants' accountant, Mr. Randy Whitt, was of the opinion that Plaintiff's businesses did in fact earn money in 2003, 2004 and 2005 with the profits, according to Mr. Whitt being as follows: $17,164 for 2003, $26,795 for 2004 and $11,666 for 2005. Mr. Whitt did not include any office expenses, travel expenses, meal expenses or freight expenses for the 2003 and 2004 estimate of profits while accounting for extensive expenses in 2005 in these areas. Mr. Whitt further excluded from income calculations all checks deposited in these business ventures from sources that did not appear related to the businesses themselves. Consequently, he did not include gift or loan checks from Plaintiff's mother, Louise Dillard, Margaret Hardcastle or Michael Paul. Likewise, he excluded the compensation checks from Key Risk (Defendant/Carrier) and other insurance checks that were deposited in the accounts of Paul's Jewelers or Paul's Paintballs. All told, Mr. Whitt excluded checks into the Paul's Jewelers and Paul's Paintballs accounts totaling $40,690 in 2003, $19,056 in 2004 and $33,548 in 2005 that were not related to the business ventures. However, Mr. Whitt included all cash deposits into these accounts as being related to the business ventures.
28. There is insufficient evidence of record to determine what, if any, earnings Plaintiff's businesses had prior to April 30, 2003. Likewise, there is insufficient evidence to determine whether or not Plaintiff increased his business profits from these two concurrent business ventures after the date of injury. However, there is evidence of record that Plaintiff *Page 11 
needed more in the way of financial assistance from his mother and other sources after the April 30, 2003 incident than before. Consequently, the Full Commission finds that the competent evidence does not establish that Plaintiff increased his earnings from his concurrent businesses following the injury of April 30, 2003.
29. From the date of the accident on April 30, 2003, Defendants have paid weekly compensation to Plaintiff, initially in the amount of $400.00 and, later, at a rate of $366.35 up until October 10, 2005.
30. Plaintiff completed his first Form 90 on February 3, 2004, which covered the time period from April 30, 2003 to February 3, 2004. Plaintiff reported that he earned wages one day with the Employer/Defendant and that he had a part time "hobby" selling paint ball equipment. When asked about his gross earnings with this job, Plaintiff stated "if any, have remained the same or less than amounts received in this part time weekend hobby while I was working at Mech Works."
31. Plaintiff completed a second Form 90 on July 20, 2005, which covered the time period from April 30, 2003, through July 20, 2005. Plaintiff again reported that he earned wages one day with the Defendant-Employer and that he had a part time "hobby" selling paint ball equipment. When asked about his gross earnings with this job, Plaintiff stated "if any, have remained the same or less than amounts received in this part time weekend hobby while I was working at Mech Works."
32. On October 10, 2005 Executive Secretary Tracey Weaver allowed Defendants to suspend payment of compensation until plaintiff had complied with discovery requests. This Order was modified on February 8, 2006 by specifically removing the right of defendants to suspend benefits. This Order modifying the previous Order specifically directed that for *Page 12 
Defendants to suspend Plaintiff's compensation, they needed to file a properly completed Form 24. Defendants asked via motion filed on or about February 20, 2006 that this Order modifying the previous Order be reconsidered or stayed. This Motion to Reconsider or Stay the previous order was denied on April 3, 2006. Defendants have never resumed payment of Plaintiff's compensation. Defendants filed a motion seeking clarification of the Order of April 3, 2006, on April 17, 2006. The issues raised in that motion are resolved in this opinion.
33. Based on the totality of the evidence of record, and in particular the opinion testimony of Drs. Wooten and Moore, the Full Commission finds that the compensable injury of April 30, 2003, caused Plaintiff's carpal boss injury and carpal tunnel syndrome and aggravated the pre-existing scaphoid condition.
34. The evidence does not establish that Plaintiff's earnings from his business increased after April 30, 2003. However, the evidence also establishes that Plaintiff demonstrated transferable skills in the pursuit of his business and that he was actively engaged in the business. Thus, the Full Commission finds that Plaintiff has not established that he was unable to earn his pre-injury wage at other employment following the compensable injury of April 30, 2003, with the exception of periods of time when a treating physician restricted him completely from work.
35. The Full Commission finds that Plaintiff did not make material misrepresentations to Defendants or medical providers in order to obtain worker's compensation benefits.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW *Page 13 
1. Plaintiff sustained a compensable injury by accident to his right hand on April 30, 2003 when the 250 to 300 pound pipe he was welding slipped off the sawhorse on which it was resting causing lacerations to Plaintiff's right fourth and fifth fingers and causing the back of his wrist to strike the sawhorse. N.C. Gen. Stat. § 97-2(6). Plaintiff's compensable injury caused or aggravated his carpal boss injury, his carpal tunnel syndrome and his scaphoid condition.
2. An employee seeking workers' compensation benefits bears the burden of proving the existence and the extent of his disability. Hendrix v.Linn-Corriher Corp., 317 N.C. 179, 345 S.E.2d 374 (1986). In a claim accepted pursuant to a Form 60, the Employee-Plaintiff is not entitled to a presumption of continuing disability, but instead retains the burden of proof. Sims v. Charmes/Arby's Roast Beef, 142 N.C. App. 154,452 S.E.2d 277, disc. rev. denied, 352 N.C. 729, 550 S.E.2d 782
(2001).
3. In order to meet his burden of proving continuing disability, Plaintiff must establish, through competent evidence, one of the following: (1) medical evidence that he is physically or mentally, as a consequence of his work injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment; (3) evidence that he is capable of some work but that it would be futile because of pre-existing conditions such as age, inexperience, lack of education, to seek other employment; or (4) evidence that he has obtained other employment at a wage less than that earned prior to the injury. Russell v. Lowes Product Distribution,108 N.C. App. 762, 425 S.E.2d 454 (1993).
4. It is well established in North Carolina that wage-earningpower, and not actual earnings, is the standard for evaluating disability. Hill v. DuBose, 234 N.C. 446, 67 S.E. 2d 371 (1951). *Page 14 
5. In cases involving self-employment, the test for determining whether the self-employed employee has earning capacity is as follows: (1) whether the employee is actually involved in the day-to-day operations of the business; and (2) whether the employee utilizes skills which would enable the employee to be employable in the competitive marketplace notwithstanding the employee's physical limitations, age, education, and experience. Lanning v. Fieldcrest Cannon, 350 N.C. 98,530 S.E.2d 54 (2000).
6. Plaintiff has failed to establish that he has been totally or partially disabled from all employment since April 30, 2003, with the exception of periods of time when Plaintiff was taken completely out of work by one of his doctors.
7. Defendants have failed without good cause to re-instate temporary total disability benefits as directed by the order of the Executive Secretary on February 8, 2006. Industrial Commission Rules 903 and 404. Thus, Defendants shall pay to Plaintiff temporary total disability benefits for the period from October 10, 2005, when the benefits were stopped pursuant to an order of the Executive Secretary issued on that date, until November 27, 2006, when Plaintiff returned to work at a wage equal to or greater than his pre-injury average weekly wage.
8. Defendants shall pay a penalty of ten percent (10%) on these past due benefits. N.C. Gen. Stat. § 97-18.
9. As Plaintiff reached maximum medical improvement in April, 2005, the temporary total disability benefits he is entitled to receive after that point exceed the 34 weeks of permanent partial disability benefits he could receive pursuant to his rating of 17% to the back. Thus, Plaintiff is not entitled to any compensation for this rating.Collins v. Speedway Motorsports Corporation 165 N.C. App. 598,185 S.E.2d 185 (2004). *Page 15 
10. Plaintiff made no material misrepresentations about his physical abilities, his work activities or his earnings to Defendants or medical providers in violation of the Workers' Compensation Act. N.C. Gen. Stat. § 97-88.2
11. No sanctions are imposed on Plaintiff or Defendants pursuant to N.C. Gen. Stat. § 97-88.1
12. Plaintiff has not shown adequate grounds for overturning the stipulation of average weekly wage in the pre-trial agreement. Thus, Plaintiff's average weekly wage shall be $549.50, which yields a compensation rate of $366.35. Lowery v. Locklear Construction,123 N.C. App. 510, 512 S.E.2d 477 (1999).
13. Plaintiff is entitled to medical treatment for the conditions causally related to his compensable injury as is reasonably necessary to affect a cure, provide relief or lessen the period of disability. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to Plaintiff temporary total disability benefits of $366.35 per week from October 10, 2005, through November 26, 2006, subject to the attorney's fee provided herein.
2. Defendants shall pay to Plaintiff a ten percent (10%) penalty on the benefits referenced in Award Paragraph 1, subject to the attorney's fee provided herein. *Page 16 
3. Defendants shall provide Plaintiff with medical treatment for the conditions causally related to his compensable injury of April 30, 2003, as is reasonably necessary to affect a cure, provide relief or lessen the period of disability.
4. Defendants shall pay directly to Plaintiff's counsel a reasonable attorney fee of twenty-five percent (25%) of the temporary total disability benefits and penalties awarded herein.
5. Defendants shall bear the costs.
This 14th day of April 2008.
S/______________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/______________________ DANNY LEE McDONALD COMMISSIONER
CONCURRING IN PART AND DISSENTING IN PART:
 S/______________________ DIANNE C. SELLERS COMMISSIONER *Page 17